# EXHIBIT 2

# Commonwealth of Massachusetts

MIDDLESEX,SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT
CIVIL DOCKET NO. 2481CV02833

LIMO GmbH , PLAINTIFF(S),

V.

VulcanForms Inc. , DEFENDANT(S)

## SUMMONS

THIS SUMMONS IS DIRECTED TO VulcanForms Inc. . (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the Middlesex County Superior Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

   a. Filing your **signed original** response with the Clerk's Office for Civil Business, Middlesex Sup Court, 370 Jackson St Lowell, MA 01852 (address), by mail or in person, **AND**

   b. Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: Dentons US LLP 101 Federal St. Ste 1900 Boston MA 02110.

3. **What to include in your response.** An **"Answer"** is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12.** If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at **www.mass.gov/courts/case-legal-res/rules of court.**

4.  **Legal Assistance.** You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5.  **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Heidi Brieger,

Witness Ho██████████nt, Chief Justice on ___November 4___ , 20 24 .

Michael A. Sullivan
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify that on_____, 20___ , I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated:_____ , 20___         Signature: _____

**N.B.     TO PROCESS SERVER:**

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

| |
|---|
| , 20___ |

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT

|  |  |
|---|---|
| LIMO GmbH | 2481CV02833 |
| Plaintiff, | Civil Action No. _____ |
| v. | |
| VULCANFORMS INC. | RECEIVED |
| Defendant. | 10/28/2024 |

## COMPLAINT AND JURY DEMAND

In this action, Plaintiff LIMO GmbH ("LIMO") seeks at least $700,000 against defendant VulcanForms Inc. ("VF") for VF's failure to compensate LIMO for complying with the Exclusivity provision under the Amended and Restated Development Agreement ("Agreement"). In exchange for agreed-upon compensation for each applicable year, LIMO agreed to the Exclusivity provision and gave up the ability to earn revenue from the sale or distribution of technology that are similar to or compete with VF's products. After VF unexpectedly terminated the Exclusivity provision, VF refused to pay LIMO for the applicable year even though LIMO complied with the Exclusivity provision. Neither the plain language of the Agreement nor the parties' course of conduct contemplated that VF would unjustly benefit from LIMO's compliance with the Exclusivity provision without any compensation to LIMO for the applicable year. Accordingly, LIMO hereby complains and alleges as follows against VF:

## THE PARTIES

1. Plaintiff LIMO GmbH is a corporation organized under the laws of the Federal Republic of Germany with a principal place of business at Bookenburgweg 4-8 44319 Dortmund, Germany.

2. Defendant VulcanForms Inc. is a corporation formed under the laws of Delaware with its principal place of business at 112 Barnum Road, Devens, MA 01434 (formerly located at 318 Bear Hill Road, Waltham, MA 02451).

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter because the Parties have consented to exclusive jurisdiction in Middlesex County, Massachusetts for disputes arising under the Amended and Restated Development Agreement.   *See* Section 15(a).

4. Venue is proper in this Court Because the Parties have consented to venue in Middlesex County, Massachusetts.   *See* Section 15(a).

## FACTS RELEVANT TO ALL CLAIMS

5. LIMO is a German corporation that is one of the world's pioneers of micro-optic, which specializes in the business of developing, commercializing, manufacturing, and selling laser and optics systems.

6. LIMO is a wholly owned subsidiary of Focuslight Technologies Inc. ("Focuslight") through strategic acquisitions of LIMO GmbH's 100% shares in 2017.   Non-party Focuslight is a publicly-traded company based in Xi'an, China (listed in Shanghai Stock Exchange, Shanghai: 688167).

7. Focuslight specializes in developing and manufacturing high-power diode laser components and materials (photon generation), laser optics (photon control), as well as

photonics modules and systems (photonics application solutions) focusing on optical communication, automotive, pan-semiconductor, and medical and health applications.

8. Focuslight has extended its business to global photonics foundry by providing the global photonics industry with process development and manufacturing services under the brand of Heptagon, offering manufacturing facilities worldwide based on customer needs.

9. VF is a Waltham-based business that develops, commercializes, manufactures, uses, leases, and sells additive manufacturing equipment. According to its website, VF "builds and operates advanced digital manufacturing infrastructure."

10. On or around August 5, 2017, VF and LIMO (collectively the "Parties") entered into an agreement to conduct a joint development program ("Prior Agreement"). As part of this joint development program, each party agreed to certain responsibilities related to the development of a "multi-kilowatt modulated line beam laser source and other laser systems and/or optionally opto-mechanical devices uniquely suited to fulfill the specifications of the equipment for VF's field of use[.]"

11. The Parties' responsibilities were governed under a Statement of Work ("SOW").

12. Under the Prior Agreement, VF agreed to pay LIMO for its development costs and expenses for the joint development program in accordance with the SOW equal to US $460,000.

13. Both VF and LIMO satisfied their respective development obligations under the SOW from the Prior Agreement.

14. The Parties later executed an Amended and Restated Development Agreement ("Agreement"), which was also effective as of August 5, 2017, because the Parties desired to expand the joint development program.    In addition, the Parties desired to

clarify and restate the terms and conditions of the Prior Agreement.    Attached as
**Exhibit A** is a true and accurate copy of the executed Agreement.

15. The Agreement supersedes the Prior Agreement and is binding and enforceable on both
VF and LIMO.

16. The Agreement is governed under the laws of the Commonwealth of Massachusetts.
*See* Section 15(a).

## THE EXCLUSIVITY PROVISION

17. As part of the continued joint development program, LIMO agreed not to enter into any
relationship or collaborate with any third party in the "VF Field of Use" (*See* Section
2(i)), which is defined as both "metal additive manufacturing and powder bed fusion
additive manufacturing (individually or combined)."

18. Provided that VF pay LIMO an amount equal to or more than $460,000, LIMO agreed
not to "(a) sell or distribute any Technology or products that are similar to or compete
with the Program Technology or VF products resulting therefrom, (b) sell or distribute
any products resulting from the Development Program in the VF Field of Use, or (c)
grant licenses for others to sell, distribute, or develop such Technology, for a minimum
period of two years from May 23, 2018[.]" *See* Section 2(j) (hereafter "Exclusivity").

19. The purpose of the Exclusivity provision was primarily to ensure development of specific
products for VF and to restrict LIMO from offering the same products to compete against
VF in the marketplace. Because LIMO's micro-optics technology can be used with other
high power laser sources in 3D printing applications, LIMO was in contact with
European 3D printing companies with the goal of establishing business relationships to
bring this technology to the next level.

20. Since VF was aware that LIMO's technology can be used with other applications, including providing new features in 3D printing, the Parties agreed to the Exclusivity provision so that in exchange for agreed-upon compensation, LIMO would be precluded from engaging in projects in the field of metal printing, which is the major market for future industrial printing, and which would compete with VF.

21. Under Section 2(j) of the Agreement, the Exclusivity period started on May 23, 2018 and would last for a minimum of two years (May 23, 2018-May 23, 2020).

22. Under Section 2(j) of the Agreement, and after the end of the initial two-year Exclusivity period, the Exclusivity period *may be extended* for a total of nine years if VF either (1) buys an increasing dollar amount of "laser systems or other components, products or services" from LIMO; OR (2) VF pays an amount "equal to the minimum profit expectation" of LIMO.

23. As explained in Section 2(j)(ii) of the Agreement, the annual Minimum Purchase or Minimum Profit requirements per year are set forth below:

ii.      VF pays an amount equal to the minimum profit expectation of LIMO, as noted in the chart below ("Minimum Profit"), for the applicable year, provided that 35% of any purchase order placed by VF for the applicable year shall be subtracted from the Minimum Profit amount owed for the applicable year to maintain Exclusivity.  By way of example in year 4, VF could maintain Exclusivity by 1) placing purchase orders with an aggregate value of $1,000,000, 2) pay LIMO $350,000 directly, or 3) order an amount of goods and services from LIMO in the amount of $100,000, for example ($35,000 of which would be subtracted from the Minimum Profit owed for such year), and pay LIMO the $315,000 difference.

| Year/Period | Minimum Purchase | or Minimum Profit |
|---|---|---|
| During development | $0 | $0 |
| Year 1-2 (from May 23, 2018) | $0 | $0 |
| Year 3 | $500,000 | $175,000 |
| Year 4 | $1,000,000 | $350,000 |
| Year 5 | $1,500,000 | $525,000 |
| Year 6 | $2,000,000 | $700,000 |
| Year 7 | $2,500,000 | $875,000 |
| Year 8 | $3,000,000 | $1,050,000 |
| Year 9 | $3,500,000 | $1,225,000 |

24. Under Section 2(j)(ii), LIMO's Exclusivity obligation would terminate "45 days after the end of *any calendar year*" in which VF fails to meet both the Minimum Purchase and the Minimum Profit amount. (Emphasis added).

25. Sections 2(i) and 2(j) of the Agreement continue to survive even after the termination of the Agreement.   *See* Section 14(c).

## THE PARTIES' COURSE OF CONDUCT RELATED TO THE EXCLUSIVITY PROVISION

26. From Year 3 (May 23, 2020-May 22, 2021) through Year 5 (May 23, 2022-May 22, 2022), VF paid either the Minimum Purchase or Minimum Profit amount to LIMO for the respective Exclusivity period to maintain Exclusivity for the future.

27. VF's course of conduct during this time was to make purchase orders throughout the applicable year to satisfy the Minimum Purchase amount, or pay LIMO the Minimum Profit amount near the end of the applicable year to compensate LIMO for maintaining Exclusivity for that applicable year.

28. Once VF satisfied the Minimum Purchase or Minimum Profit amount, VF had the option to extend the Exclusivity for the next applicable year under the Agreement. This contractual intention is clearly reflected in the example case in Section 2(j)(ii) of the Agreement.

29. In Year 3 (May 23, 2020-May 22, 2021), VF made purchase orders throughout the year totaling $1,036,380.86, which satisfied the Minimum Purchase amount.

30. In a letter, dated April 26, 2022, VF's President and CEO, Martin Feldman, affirmed VF's intent to "continue paying the Minimum Profit amount from Year 4 to Year 9 (May 23, 2027)." The letter also acknowledged that VF "shall satisfy its obligations for Minimum Profit Payments by paying $350,000 on or before May 23, 2022." Attached as **Exhibit B** is a true and accurate copy of this April 26, 2022 letter.

31. For Year 4 (May 23, 2021-May 22, 2022), VF paid LIMO $350,000 on May 16, 2022, which represented the Minimum Profit amount.

32. For Year 5 (May 23, 2022-May 22, 2023), VF paid LIMO $525,000 on May 9, 2023, which satisfied the Minimum Profit amount.

33. For Year 6 (May 23, 2023-May 22, 2024), however, VF failed to pay either the Minimum Purchase or the Minimum Profit amounts at any time during the Year 6 (May 23, 2023-May 22, 2024) Exclusivity period.

34. Instead, on or about June 26, 2024, VF notified LIMO of its intent to terminate Exclusivity under Section 2(j) of the Agreement *after* LIMO had already dutifully complied with the Exclusivity provision for Year 6 (May 23, 2023-May 22, 2024) for which it did not receive *any* payment from VF.   Attached as **<u>Exhibit C</u>** is a true and accurate copy of the June 26, 2024 letter from VF.

35. In the June 26, 2024 letter from VF to LIMO, VF wrote that the "exclusivity obligations will terminate 45 days after the end of this calendar year, or February 14, 2025."

36. Because VF provided notice of its intent to terminate the Exclusivity provision on June 26, 2024 after LIMO had already fulfilled its Exclusivity obligation for the entire Year 6 (May 23, 2023-May 22, 2024) in reasonable anticipation that it would receive the Minimum Profit amount for Year 6, Section 2(j) of the Agreement does not absolve or otherwise excuse VF's contractual obligation to compensate LIMO for the Exclusivity period covering Year 6 (May 23, 2023-May 22, 2024).

37. Because VF provided notice of its intent to terminate the Exclusivity provision on June 26, 2024 – well into Year 7 (May 23, 2024-May 22, 2025) of the Exclusivity period – VF's notice served only to terminate the Exclusivity provision *prospectively,* which applied to Year 7 (May 23, 2024-May 22, 2025), Year 8 (May 23, 2025-May 22, 2026), and Year 9 (May 23, 2026-May 22, 2027) only.

38. A contrary interpretation would unjustly enrich VF by providing it with the benefits of the Exclusivity provision for nearly *two years* (May 23, 2023-February 14, 2025) covering Year 6 (May 23, 2023-May 22, 2024) and most of Year 7 (May 23, 2024-May 22, 2025) without <u>any</u> payment or other financial compensation to LIMO during that corresponding time period.

39. Neither the plain language of the Agreement nor the Parties' course of conduct contemplated that VF would unjustly benefit from nearly two years of the Exclusivity provision without any compensation to LIMO during that corresponding time period.

40. Throughout this entire relevant time period (Year 1 (May 23, 2018-May 22, 2019) through Year 6 (May 23, 2023-May 22, 2024)), LIMO has dutifully complied with the Exclusivity provision.   LIMO continues to comply with its Exclusivity obligation, and expect to comply until February 14, 2025.

41. By complying with the contractual Exclusivity provision, and relying on the contractual promise from VF to pay either the Minimum Purchase or Minimum Profit amounts, LIMO stopped the parallel development of multi-channel segmented line bam processing to focus on VF and gave up the ability to earn revenue from the sale or distribution of technology that are similar to or compete with either the program technology or VF's products within VF's Field of Use, as defined in the Agreement.

42. VF's failure to fulfill its contractual obligations to LIMO under the Agreement has caused damage to LIMO in the form of lost contract benefits and lost profits based upon its inability to sell or distribute products covered under the Exclusivity provision.

### VF REFUSES TO PAY LIMO FOR EXCLUSIVITY

43. On or about July 12, 2024, Focuslight Technologies Inc., on behalf of LIMO, sent a demand letter to the president of VF, Martin C. Feldmann, demanding $700,000 for the Minimum Profit as regards Year 6 under the Agreement. Attached as **Exhibit D** is a true and accurate copy of the July 12, 2024 demand letter.

44. On or about August 15, 2024, VF responded to the demand letter and refused payment of the Minimum Profit amount under the Agreement.    Attached as **Exhibit E** is a true and accurate copy of the response letter.

45. Despite good faith efforts to resolve the dispute, the Parties have been unable to do so.

46. The Parties have agreed to waive the mediation requirement set forth in Section 15(a) of the Agreement.

47. The Agreement remains in force.

**CLAIMS FOR RELIEF**

**COUNT I**
**BREACH OF CONTRACT**

48. LIMO repeats and restates Paragraphs 1-47 above as if fully set forth herein.

49. The Agreement is a valid and enforceable contract between LIMO and VF.

50. LIMO has performed its obligations under the Agreement, including but not limited to complying with its Exclusivity obligation under Section 2(j) of the Agreement for Year 6 (May 23, 2023-May 22, 2024).

51. LIMO continues to perform under the Agreement, including maintaining Exclusivity until February 14, 2025.

52. Under the Agreement, VF was obligated to compensate LIMO for the Exclusivity provision set forth in Section 2(i) and 2(j), in particular the Exclusivity provision covering Year 6 (May 23, 2023-May 22, 2024).

53. VF has breached the Agreement by failing to pay LIMO either the Minimum Purchase or Minimum Profit amounts as set forth in Section 2(j).

54. As a direct result of VF's failure to pay LIMO either the Minimum Purchase or Minimum Profit amounts, LIMO has suffered damages, including but not limited to lost contractual

benefits and lost business based upon its inability to sell or distribute any products covered under the Agreement during the Year 6 (May 23, 2023-May 22, 2024) time period.

WHEREFORE, LIMO seek appropriate relief as prayed for hereinafter.

## <u>COUNT II</u>
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

55. LIMO repeats and restates Paragraphs 1-54 above as if fully set forth herein.

56. The covenant of good faith and fair dealing is implied in every contract, including the Agreement, which was negotiated and executed between sophisticated parties.

57. LIMO reasonably expected that VF would compensate LIMO for each year the Exclusivity provision was in effect in exchange for LIMO's agreement to abide by the Exclusivity provision under the Agreement.

58. VF complied with this expectation by paying either the Minimum Purchase or the Minimum Profit amount for Year 3, Year 4 and Year 5.

59. LIMO reasonably expected that VF would continue to compensate LIMO for the Exclusivity provision under the Agreement based on the April 26, 2022 Letter from VF's CEO and the Parties' course of conduct.

60. VF has intentionally breached the implied covenant of good faith under the Agreement by notifying LIMO, without warning and contrary to the April 26, 2022 letter, that it intended to terminate the Exclusivity provision *after* LIMO had already satisfied its Exclusivity obligation to VF during Year 6 (May 23, 2023-May 22, 2024).

61. VF's notification to LIMO on June 26, 2024 concerning its intent to terminate Exclusivity was deliberate and lacked good faith. By timing the notification until *after* LIMO had already completed its Year 6 (May 23, 2023-May 22, 2024) Exclusivity

obligation, VF sought to unjustly obtain nearly two years (May 23, 2023-February 15, 2025) of Exclusivity without paying LIMO a single penny as compensation for the Exclusivity obligation.

62. The timing of VF's June 26, 2024 notification was purposeful and had the impact of destroying or otherwise injuring the rights of LIMO to receive the fruits under the Agreement because it has, and continues to, unfairly deprive LIMO of its compensation for complying with the Year 6 (May 23, 2023-May 22, 2024) Exclusivity obligation.

63. As a result of VF's wrongful actions, LIMO has been damaged.

WHEREFORE, LIMO seeks appropriate relief as prayed for hereinafter.

### Count III
### UNJUST ENRICHMENT

64. LIMO repeats and restates Paragraphs 1-63 above as if fully set forth herein.

65. At all relevant times, in particular during the Year 6 (May 23, 2023-May 22, 2024) Exclusivity period, LIMO complied with the Exclusivity provision by declining to sell or distribute any technology or products that were similar to or otherwise were part of VF's Field of Use, as defined by the Agreement.

66. LIMO's Exclusivity obligation to VF conferred a substantial benefit to LIMO by allowing VF to freely sell and distribute its own products without additional competition from LIMO or third-parties in which LIMO could have been involved with.

67. VF's retention of the Exclusivity benefit without payment or compensation of the same to LIMO is against the fundamental principles of justice and good conscience, and therefore constitutes unjust enrichment.

68. As a result of VF's wrongful actions, LIMO has been damaged.

WHEREFORE, LIMO seeks appropriate relief as prayed for hereinafter.

## COUNT IV
## DECLARATORY JUDGMENT

69. LIMO repeats and restates Paragraphs 1-68 above as if fully set forth herein.

70. Based upon the allegations set forth above, an actual controversy has arisen among the
Parties concerning LIMO's entitlement to payment from VF for Year 6 (May 23, 2023-
May 22, 2024) fulfillment of its Exclusivity obligations.

71. LIMO therefore seek judicial declarations, pursuant to MGL c. 231A, §1 et. seq.:

    a.  That VF has breached Section 2(j) of the Agreement;

    b.  That VF is contractually obligated to compensate LIMO $700,000 for the Minimum
Profit amount under Section 2(j) of the Agreement;

    c.  That VF has breached the implied covenant of good faith by injuring the rights and
reasonable expectations of LIMO under the Agreement; and

    d.  That VF has been unjustly enriched by its failure to compensate LIMO for the Year
6 Exclusivity period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff LIMO GmbH respectfully requests that the Court enter Judgment
in their favor and prays for the Court to award the following relief:

    a.  Enter an Order declaring that VF has breached Section 2(j) of the Agreement by
failing to compensate LIMO for Year 6 (May 23, 2023-May 22, 2024) Exclusivity
under the Agreement;

    b.  Enter an Order declaring that VF is contractual obligated to compensate LIMO for
Year 6 (May 23, 2023-May 22, 2024) of the Agreement;

    c.  Enter an Order declaring that VF has breached the implied covenant of good faith;

d.  Enter an Order declaring that VF has been unjustly enriched at the expense of
    LIMO;

e.  Enter Judgment, awarding actual, compensatory, unjust enrichment, and/or
    quantum meruit damages in an amount of at least $700,000 or another amount to
    be determined at trial;

f.  Award prejudgment interests and costs; and

g.  Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff LIMO GmbH hereby demands a trial by jury on all issues triable.

Dated:   October 28, 2024                    Respectfully Submitted,

                                             LIMO GmbH

                                             By its attorneys,

                                             */s/ Tony K. Lu*
                                             _____
                                             Tony K. Lu, Esq. (BBO# 678791)
                                             Dentons US LLP
                                             101 Federal Street, Suite 1900
                                             Boston, MA 02110
                                             Telephone: (617) 235-6817
                                             tony.lu@dentons.com

# Exhibit A

## <u>AMENDED AND RESTATED DEVELOPMENT AGREEMENT</u>

This Amended and Restated Development Agreement ("Agreement") is effective as of August 5, 2017 ("Effective Date"), by and between LIMO GmbH ("LIMO"), a corporation formed under the laws of the Federal Republic of Germany with a principal place of business at Bookenburgweg 4 - 8, 44319 Dortmund, Germany registered in the Commercial Register of the Local Court of Dortmund under HRB 7603 and its registered office in Bookenburgweg 4-8 in D-44319 Dortmund; and VulcanForms Inc., a corporation formed under the laws of the State of Delaware, United States of America, with a principal place of business at 318 Bear Hill Road, Waltham, MA, 02451, USA ("VF"). LIMO and VF may also be individually referred to as a "Party" and collectively referred to as the "Parties."

### Recitals

A.      LIMO is in the business of developing, commercializing, manufacturing, and selling laser and optics systems.

B.      VF is in the business of developing, commercializing, manufacturing, using, leasing, and selling additive manufacturing equipment.

C.      The Parties conducted a joint development program pursuant to that certain Definitive Agreement between them, dated as of August 5, 2017 ("Prior Agreement").

D.      The Parties desire to expand their joint development program, and to amend and restate the Prior Agreement such that their joint development program, including all work performed under the initial SOW entered into in connection with the Prior Agreement and attached hereto as **Appendix 1,** will be governed by the terms and conditions of this Agreement. The Parties also desire to amend and restate the Prior Agreement in its entirety to, among other things, (i) expand the scope of the development work to be performed, including with reference to additional SOWs (as defined below), (ii) consolidate and clarify confidentiality obligations pursuant to the applicable non-disclosure agreement, (iii) update agreement definitions related to intellectual property and technology, (iv) change the applicable governing law and add customary contract terms to the Parties' agreement, (v) add customary representations and warranties, (vi) clarify and redefine the Parties' ownership, licenses and exclusive rights with respect to technology developed as a result of the joint development program, (vii) clarify VF's exclusivity period rights and conditions, (viii) permit VF to enforce rights licensed exclusively to VF against third parties, and (ix) add termination provisions.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree to amend and restate the Prior Agreement in its entirety as follows, as if the Prior Agreement had never been entered into and the Parties' performance thereunder with respect to the Phase 1 SOW (as defined below) was performed hereunder:

1.      Definitions

      a.      "LIMO Affiliates" shall mean any entity that controls, is under common control with, or is controlled by LIMO, including, but not limited to, Focuslight

Technologies Inc. For purposes of this definition, "control" shall mean legal or beneficial ownership of more than fifty percent (50%) of the voting shares of an entity, or the legal right to control the affairs of an entity.

b.   "Background Technology" shall mean Technology relevant to the Development Program, including Technology related to the VF Field of Use, that is conceived of, developed, owned, or controlled by LIMO or VF as of the Effective Date. The LIMO Background Technology shall include that described in the attached **Appendix 2**. The VF Background Technology shall include that described in the attached **Appendix 3**.

c.   "Future Technology" shall mean Technology other than Program Technology that is conceived of, developed, owned, or controlled by one of the Parties any time after the Effective Date and prior to the termination or expiration of the Agreement.

d.   "Intellectual Property Rights" shall mean all current and future worldwide common law and statutory rights, whether arising under the laws of the United States of America or any other state, country, jurisdiction, government, or public legal authority, in, to, or associated with (i) Patents; (ii) copyrights, copyright registrations and applications therefor, moral rights, and mask work rights; (iii) the protection of trade or industrial secrets or confidential information; (iv) domain names, uniform resource locators, other names and locators associated with the Internet, and applications or registrations therefor; (v) industrial designs; (vi) all rights in databases and data collections; (vii) all other intellectual property rights and proprietary rights (excluding trademarks, service marks, and other designations of source or origin); (viii) any analogous rights to those set forth above; (ix) divisions, continuations, continuations-in-part, counterparts, re-examinations, post-grant reviews, inter partes reviews, supplemental examinations, provisionals, renewals, reissuances, and extensions of the foregoing (as applicable), including the right to claim priority to the Patents and applications; and (x) rights to apply for, file for, certify, register, record, or perfect any of the foregoing.

e.   "LEDP" or "Low Energy Density Product" shall mean any product that is covered by or made using Program Technology, and that (i) has power density no greater than 500 watts per millimeter squared, (ii) does not have the power density sufficient to be used in the VF Field of Use, and (iii) is made, used, offered for sale, and sold for surface treatment applications solely limited to glass hardening, photovoltaic annealing, metal surface annealing, and multi-spot-polymer welding purposes.

f.   "New Optical Element Technology" shall mean the optical element components Technology developed by LIMO hereunder. For the avoidance of doubt, "New Optical Elements Technology" shall not include any laser array system Technology developed by LIMO hereunder.

g.   "Patents" shall mean all classes or types of patents, utility models and design patents (including originals, divisions, continuations, continuations-in-part,



extensions, or reissues), and applications for these classes or types of patent rights in all countries in the world.

h.  "Program Technology" shall mean Technology that is conceived, developed, and/or reduced to practice during the performance of work pursuant to the Development Program (as defined below), any time after the Effective Date and prior to the termination or expiration of the Agreement, whether solely by one Party or jointly by the Parties, and will not include the Background Technology of the Parties.

i.  "Qualified Customer(s)" shall mean any person or entity (i) whose principal business and intention for purchasing LEDP is known to be for use in surface treatment applications solely limited to glass hardening, photovoltaic annealing, metal surface annealing, or multi-spot-polymer welding purposes, (ii) who does not conduct business transactions or operations within the VF Field of Use or the general field of additive manufacturing, and (iii) who does not make, use, sell, or offer for sale any products that compete with products made, used, sold, or offered for sale by VF.  For the avoidance of doubt, any person or entity that conducts business in or in connection with the VF Field of Use shall not be a "Qualified Customer."

j.  "SOW" shall mean any written statement of work executed by both Parties, which describes the work to be performed by the Parties under this Agreement, including any relevant objectives, roles of the respective Parties, deliverables and applicable specifications, development stages, delivery schedules, milestones, budget and payment terms, and so forth.  Each SOW will be attached and incorporated into this Agreement upon execution, and may be amended from time to time upon mutual written agreement of the Parties.

k.  "Supply Agreement" shall mean a framework supply agreement entered into as provided in Section 5 of this Agreement.

l.  "Technology" shall mean works of authorship (whether or not copyrightable, including software (whether in source code or object code format), documentation, notes, records, text, and artwork), designs, inventions (whether or not patentable), ideas, concepts, improvements, developments, discoveries, information, and trade secrets.

m.  "VF Field of Use" shall mean the fields of both metal additive manufacturing and powder bed fusion additive manufacturing (individually or combined).

n.  "VFLOS" shall mean the laser, optical, and ancillary systems manufactured and assembled by LIMO for VF, or for sale to VF (also known as, "VulcanForms Laser Optical System").

2.  Development Program

Date Filed 10/28/2024 11:20 AM
Superior Court - Middlesex
Docket Number

a.      LIMO and VF shall cooperate, as set out in this Agreement, in order to develop a multi-kilowatt modulated line beam laser source and other laser systems and/or optionally opto-mechanical devices uniquely suited to fulfill the specifications of the equipment for the VF Field of Use as further described in the SOWs hereto ("Development Program").

b.      The initial SOW for the Development Program is attached as **Appendix 1** ("Phase 1 SOW") and is hereby incorporated herein.  The Parties acknowledge that (i) LIMO has fulfilled all development obligations under Phase 1 SOW, and (ii) VF has fulfilled all payment and other obligations under Phase 1 SOW, including payment obligations reduced in connection with certain equipment being procured by VF directly.  For the avoidance of doubt, all terms and conditions of this Agreement apply to the Phase 1 SOW, including that all Technology conceived, developed, or reduced to practice by LIMO pursuant to the Phase 1 SOW shall constitute Program Technology hereunder, and be subject to the assignments, licenses, and representations and warranties made herein accordingly.

c.      Each Party shall disclose to the other Party all information that is reasonably relevant to accomplishing the development goals of the Development Program.

d.      Each Party shall designate a Development Program technical representative.  Such representatives will work to ensure that each Party fully supports the Development Program in a manner that will timely promote the action items set forth in the SOWs.  Ongoing review, technical assistance, and consultation shall continue throughout the duration of the Development Program.  Upon reasonable notice and at a mutually convenient time, VF's shall have the right to send VF's technical representatives to visit LIMO facilities to review and monitor the work being performed hereunder and LIMO shall not unreasonably withhold permission and access for such visits.

e.      The Development Program shall be subject to periodic review and, if the Parties mutually agree in writing, adjustment.  Said adjustments are to be made with consideration of the Parties' ongoing development efforts and the ever-changing demands of the marketplace.

f.      The Development Program shall continue until all SOWs are completed, or VF elects not to proceed to the next development stage in accordance with Section 2.h.iii.

g.      Payment and service obligations are as follows:

i.      VF agrees to pay LIMO for, and LIMO agrees to perform, services for the Development Program in accordance with the Phase 1 SOW attached hereto as **Appendix 1**, a total amount equal to US $460,000.  VF acknowledges that all development stages set forth in Phase 1 SOW are complete, and LIMO acknowledges that all amounts owed by VF in connection with Phase 1 SOW have been duly received.



ii.     The Parties anticipate that they will enter into additional SOW(s) in the future that will be incorporated herein upon execution by both Parties.

h.     The SOWs will set out the portions of the respective budget, which are allotted to the certain development stages and activities.  Any and all expenses and costs incurred by LIMO in performance of this Agreement and SOWs, including remunerations for employee inventors, patent fees, and other costs are the sole responsibility of LIMO.

i.     The full amount allotted to each development stage set forth in an SOW shall be invoiced by LIMO and paid by VF in accordance with the payment terms set forth in the applicable SOW.

ii.     Upon the completion of each development stage set forth in an SOW, VF shall, in its sole discretion, determine whether the development goal for that stage has been reached, and whether LIMO may proceed with the developments of the next stage.

iii.     If VF, acting in its free discretion, determines that the objectives of a development stage have not been reached, and that LIMO shall not proceed with the development of the next stage, the Development Program will end unless provided otherwise by VF in the notice to not proceed issued to LIMO.

iv.     In case the Development Program ends prior to completion of the applicable SOW(s), this Agreement, in particular including Sections 2.i., 2.j., 3 and 4, will continue to apply to the development results achieved to that point of Development Program termination.

i.     During the duration of the Development Program and Exclusivity (as defined below), LIMO and LIMO Affiliates shall not enter into a similar development relationship, or otherwise collaborate with a third party in the VF Field of Use.

j.     Provided that VF pays LIMO an amount equal to or more than $460,000 for the work set forth in Phase 1 SOW (and the Parties hereby agree and acknowledge that $460,000 has been paid by VF to LIMO for the work set forth in Phase 1 SOW), LIMO and LIMO Affiliates shall not (a) sell or distribute any Technology or products that are similar to or compete with the Program Technology or VF products resulting therefrom, (b) sell or distribute any products resulting from the Development Program in the VF Field of Use, or (c) grant licenses for others to sell, distribute, or develop such Technology, for a minimum period of two years from May 23, 2018 (such obligation referred to herein as "Exclusivity").  The initial Exclusivity period may be extended over subsequent years, up to a total of nine years if either:

i.     subsequent to the end of the initial two-year Exclusivity period, VF buys an increasing dollar amount of laser systems or other components, products, or services from LIMO starting at five hundred thousand US dollars ($500,000) in the



third year after the Phase 1 SOW ends, and increasing by five hundred thousand US dollars ($500,000) in each year thereafter ("Minimum Purchase"); or

ii.      VF pays an amount equal to the minimum profit expectation of LIMO, as noted in the chart below ("Minimum Profit"), for the applicable year, provided that 35% of any purchase order placed by VF for the applicable year shall be subtracted from the Minimum Profit amount owed for the applicable year to maintain Exclusivity.  By way of example in year 4, VF could maintain Exclusivity by 1) placing purchase orders with an aggregate value of $1,000,000, 2) pay LIMO $350,000 directly, or 3) order an amount of goods and services from LIMO in the amount of $100,000, for example ($35,000 of which would be subtracted from the Minimum Profit owed for such year), and pay LIMO the $315,000 difference.

| Year/Period | Minimum Purchase | or Minimum Profit |
| --- | --- | --- |
| During development | $0 | $0 |
| Year 1-2 (from May 23, 2018) | $0 | $0 |
| Year 3 | $500,000 | $175,000 |
| Year 4 | $1,000,000 | $350,000 |
| Year 5 | $1,500,000 | $525,000 |
| Year 6 | $2,000,000 | $700,000 |
| Year 7 | $2,500,000 | $875,000 |
| Year 8 | $3,000,000 | $1,050,000 |
| Year 9 | $3,500,000 | $1,225,000 |

LIMO's Exclusivity obligation will terminate 45 days after the end of any calendar year in which VF fails to meet both the Minimum Purchase and the Minimum Profit amount, unless both Parties agree in writing to extend the Exclusivity.

3.      Ownership of Technology

a.      All LIMO Background Technology and LIMO Future Technology, and all Intellectual Property Rights therein, shall be owned and controlled by LIMO.

b.      All VF Background Technology and VF Future Technology, and all Intellectual Property Rights related thereto, shall be owned and controlled by VF.

c.      All Program Technology shall be owned and controlled as follows:

i.      VF shall own and control all rights, title, and interests in the Program Technology and all Intellectual Property Rights related thereto, excluding the Program Technology that constitutes New Optical Elements Technology and Intellectual Property Rights thereto.



    ii.    LIMO shall own and control all rights, title, and interests in the portion of Program Technology that constitutes New Optical Elements Technology and all Intellectual Property Rights thereto.

d.    To the extent that the allocation of rights, title, and interests in and to the Program Technology, as specified in this Section 3, do not automatically vest in the applicable Party, the other Party (the "Assignor") hereby assigns, transfers, and conveys (and agrees to assign, transfer, and convey, or to cause to be assigned, transferred, or conveyed) to the applicable Party (the "Assignee") such of the Assignor's rights, title, and interests in and to all such Program Technology and any Intellectual Property Rights thereto as is necessary to achieve such allocation. The Assignor will provide, at the Assignee's expense, for reasonable out-of-pocket costs, all assistance reasonably required by the Assignee to consummate, record and perfect the foregoing assignment, including, but not limited to, signing all papers and documents necessary to register and/or record such assignment with the United States Patent & Trademark Office, United States Copyright Office, other state and federal agencies, and all corresponding government agencies and departments in all other countries, where applicable. Assignor hereby appoints Assignee as its attorney-in-fact to act as Assignor to execute and file the papers and documents specified in this Section 3 if Assignor is unwilling or unable to comply with the foregoing sentence. This appointment is coupled with an interest and is irrevocable.

e.    Each Party represents and warrants to the other that:

    i.    such Party has not filed, or permitted to be filed on its behalf, any application or registration with respect to Program Technology or such Party's Intellectual Property Rights therein that would conflict with the terms of this Agreement;

    ii.    such Party has not transferred, assigned, or licensed (whether exclusively or non-exclusively) Program Technology or Background Technology exclusively licensed hereunder; and

    iii.    each item of Background Technology is and was at all relevant times either: (1) owned solely by such Party free and clear of any encumbrances (other than licenses under Intellectual Property Rights that do not conflict with any terms of this Agreement), or (2) rightfully used and authorized for use by such Party and their permitted successors and licensees.

4.    License Agreement and Patents

a.    LIMO hereby grants to VF a fully-paid, royalty-free, worldwide, transferable, sublicensable (through multiple tiers of sublicenses), perpetual, and irrevocable license to make, use, have made, sell, offer for sale, and import any product, to practice any process, and to copy, perform, display, prepare derivatives of, and distribute any work of authorship, under LIMO's Intellectual Property Rights in

and to the New Optical Element Technology, and the LIMO Background Technology relevant to the Development Program. The preceding license is: (i) exclusive with respect to New Optical Element Technology within the VF Field of Use; (ii) non-exclusive with respect to the LIMO Background Technology; and (iii) non-exclusive with respect to New Optical Element Technology outside the VF Field of Use.

b.     If LIMO observes or has reason to suspect a third party to be infringing any right exclusively granted or assigned to VF under this Agreement, LIMO shall promptly notify VF in writing of the suspected infringement.

c.     If a third party infringes or allegedly infringes any right granted exclusively to VF under this Agreement, VF shall have the exclusive right to, but is not obligated to, prosecute the infringer by appropriate legal proceedings. VF shall be responsible for all costs and expenses of any such enforcement activities, including legal proceedings. LIMO shall cooperate in all reasonable respects with any such enforcement activities at the request of VF, including by joining legal proceedings as a plaintiff party. LIMO may be represented by LIMO's own counsel in any such legal proceedings, at LIMO's own expense, acting in an advisory but not controlling capacity. The prosecution, settlement, or abandonment of any proceeding under this Section shall be at VF's sole discretion. Recoveries collected by VF shall be paid (i) first, to VF in the amount of all documented and reasonable out-of-pocket costs and expenses incurred by VF in such action, (ii) then to LIMO to reimburse LIMO for its documented and reasonable out-of-pocket costs and expenses incurred in cooperating with VF in such action as requested by VF, and (iii) the remainder, if any, shall be retained by VF.

d.     LIMO shall prepare, file, and maintain all domestic and foreign Patents covering New Optical Element Technology and any Technology exclusively licensed to VF pursuant to Section 4.a, using counsel reasonably acceptable to VF. LIMO shall provide VF with copies of all official actions and other communications received by LIMO or its patent counsel, or submitted by LIMO or its patent counsel, from or to the United States Patent and Trademark Office (and corresponding foreign authorities) with respect to the Patents covering the New Optical Element Technology and any Technology licensed exclusively to VF hereunder. In the event that LIMO does not prosecute and maintain any Patents as described in this Section 4.d, VF shall have a right of first refusal to own and maintain such Patents, and if VF elects to exercises such right, LIMO shall, and hereby does, assign all rights, title, and interests in such Patents to VF. In such case, VF shall, and does hereby, grant to LIMO a non-exclusive, perpetual, fully-paid, royalty-free, worldwide and irrevocable license to use and practice any Technology claimed by such Patents outside the VF Field Of Use.

e.     In case of LIMO employee inventions applicable to Program Technology or Technology exclusively licensed to VF hereunder, LIMO shall claim those within the applicable statutory term. The employee-inventor's remuneration shall be paid

by LIMO, regardless of whether the Technology is assigned to VF under this Agreement.

f.   VF hereby grants to LIMO, under VF's rights in and to the Program Technology, a non-exclusive, nontransferable, non-sublicensable, worldwide, royalty-free license during the term of this Agreement to make, use, offer for sale, and sell LEDP solely to Qualified Customers.  To add further clarity, LIMO shall not make, use, sell, or offer for sale any LEDP to any person or entity except for Qualified Customers or VF.  Further, LIMO shall not make, use, sell, or offer for sale, or otherwise distribute any product covered by or made using Program Technology except as expressly permitted by this Section.  If applicable, LIMO shall stamp, print or otherwise mark on every LEDP that LIMO makes, uses, sells, or offers for sale, such notice as is provided for by U.S. patent law as a prerequisite for the collection of damages from infringers.

g.   During the term of the Agreement, LIMO shall not make, offer for sale, sell or otherwise distribute any products that compete with or replace products made, sold, offered for sale, or otherwise distributed by VF in the VF Field of Use.

h.   If any person or entity who is not a Qualified Customer is found to have acquired or used LEDP in a fashion that competes with VF in the VF Field of Use, and if in less than two weeks after notification of such finding LIMO does not provide a truthful reason (including any supporting evidence reasonably requested by VF) for the non-Qualified Customer person or entity possessing the LEDP product that is acceptable to VF at VF's sole discretion, then VF's obligations pursuant to Section 2(j), including Minimum Purchase and Minimum Profit payment obligations, shall expire but LIMO shall continue to be bound by Exclusivity for the maximum period otherwise provided for under Section 2(j).

i.   Promptly at the end of each fiscal quarter, LIMO shall provide a written report to VF identifying (i) each Qualified Customer to whom LIMO sold or agreed to sell LEDP to, and (ii) the specific type of LEDP and quantity thereof that LIMO sold or agreed to sell to such Qualified Customer, for such quarter.  During the term of this Agreement and for a period of one year after any expiration or termination of the Agreement, LIMO shall maintain accurate books and records and grant VF access to such records upon reasonable notice solely for purposes of, and to the extent reasonably necessary for, verifying compliance with this Section.

5.   Supply Agreement

After the successful completion of the Development Program or successful completion of Technology development thereunder, as determined by VF in its sole discretion, LIMO and VF shall promptly enter into a Supply Agreement on the following terms and conditions or similar.

a.   The Supply Agreement shall provide for the sale of equipment (in particular, laser devices) and spare parts, shall have an initial term of ten years, and may be renewed



based on mutually agreeable terms for a further ten-year period in good faith. LIMO shall supply the equipment, according to individual orders, to be placed by VF.

b.  The sale price for VFLOS shall be fair market value based upon the price at which LIMO sells products of similar complexity or similar cost-to-produce to third parties at the time the Supply Agreement is entered into and subject to adjustment to reflect changes in price of raw materials and components.

c.  LIMO shall provide a warranty (that the equipment is of the agreed quality, free from defects and fit for the purpose agreed upon or known to LIMO) which would not be less than one year on equipment and three months on spare parts from the date of delivery of such equipment or spare parts.

d.  LIMO will continue to support and provide spare parts to VF for VF's installed base of equipment at conditions reasonable and comparable to conditions offered to other customers of LIMO so long as such equipment is in use.  Should LIMO permanently limit its production and/or consulting capacities, or, for other critical and justifiable reasons, be no longer able to supply spare parts and/or support for the installed equipment, LIMO shall be obligated to announce the end of the delivery and/or the end of support in writing at least three months prior to terminating delivery of support and spares.  Under no circumstance shall LIMO be allowed to not support and supply to VF while supplying similar support or spare parts to other parties.  Any such support and spare parts, even after the termination, will be subject to the standard warranty offered during purchase.  Additionally, at VF's request, LIMO will introduce VF to its suppliers and other relevant parties who can provide support and spares to VF.

e.  In case the parties cannot agree on a framework supply agreement governing the conditions at which LIMO is obliged to supply to VF, the conditions at which LIMO has to supply to VF shall be determined by the mediator according to clause 16 b), which, in this regard, shall determine and define the full content of a framework supply agreement between VF and LIMO.  The mediator shall have full discretion to define the contents of the supply agreement insofar as they are not provided for in a-d of this Section 5.

6.  NDA Agreement

LIMO and VF have entered into a certain non-disclosure agreement, dated as of August 5, 2016 ("NDA") attached hereto as **Appendix 4**.  It is the mutual understanding of the Parties that the provisions of the NDA will be effective and governing confidentiality obligations of the Parties for this Agreement, the Development Program, and any further agreements between the Parties for the later of (i) expiration of this Agreement, (ii) completion of the Development Program, (iii) the term of the Supply Agreement, or (iv) for the period of Exclusivity.



7.    Additional Terms of the Agreement

a.    LIMO will carry out the development work on a best-efforts basis and according to the highest standards of professionalism in the industry.  LIMO will observe the requirements, conditions, and dates contained in the Appendices to this Agreement.

b.    VF shall promptly provide LIMO with the necessary information and documents for the implementation of the Agreement and render reasonably necessary assistance.

c.    LIMO shall inform VF immediately of any measures that would improve the development, as well as any occurrences that may bring into question the technical feasibility of the development and/or cause delays of the development.

d.    Changes, amendments, or supplements to the Appendices to this Agreement, in particular, changes to the parameters agreed for product development, can only be effected with the prior written consent of LIMO and VF.

e.    LIMO is only entitled to reject changes, amendments, or supplements requested by VF:

i.    if such changes, amendments, or supplements seem impracticable (technically not feasible) from the point of view of an expert agreed by both Parties or in the absence of agreement by the mediator according to Section 15.b; or

ii.    if the necessary changes, amendments, or supplements lie beyond LIMO's area of reasonable expertise.

In all other cases, LIMO is obliged to give its consent to the change according to d above.  LIMO may not reject requests for change because extra work or costs will be required from LIMO.  Rather, LIMO has to make a correct and adequate calculation of the additional costs and present this to VF.  The correctness and adequacy of the calculation are subject to the review by an expert agreed by both Parties or in the absence of agreement by the mediator according to Section 15.b. If VF accepts the extra costs stated by LIMO, or stated by the expert or the mediator after the review, LIMO has to implement the change or amendment.

f.    LIMO will employ only qualified personnel in the development work hereunder.

g.    Any use of subcontractors to fulfill LIMO's obligations under this Agreement is subject to (i) VF's approval of the subcontractor, and (ii) a written subcontracting agreement approved prior to execution by VF, in each case provided that VF's approval may not be unreasonably withheld.  VF shall not have any obligation to a subcontractor engaged by LIMO.  The use of any subcontractor shall not release LIMO from its timely compliance hereunder or under any SOW, and LIMO shall be responsible for all payments to subcontractors.



h.    Upon completion of each development stage of the Development Program, LIMO will send a detailed progress report to VF that will include the results achieved, and a declaration as to whether the intended purpose of this Agreement, can be realized. Nonetheless, LIMO agrees that VF is permitted to monitor the development in real time as the project progresses.

8.    Representations and Warranties

a.    Each Party represents and warrants to the other Party as follows:

i.     Such Party has the full corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder.  The execution, delivery, and performance of this Agreement has been duly and validly authorized by such Party, and this Agreement constitutes a valid and binding agreement of such Party enforceable against the other Party in accordance with its terms.

ii.    The execution, delivery, and performance by such Party of this Agreement do not and will not (a) contravene or conflict with the certificate of incorporation, memorandum and articles of association, or equivalent organizational documents of such Party, (b) contravene or conflict with any agreement, contract, instrument, or understanding, oral or written, to which it is a Party, or by which it may be bound, or (c) violate any law or regulation of any court, governmental body or administrative, or other agency having authority over it.

iii.   To the knowledge of such Party, the use and exploitation by the other Party of the Program Technology assigned to the other Party hereunder will not (a) infringe, violate, or misappropriate the Intellectual Property Rights of any third party or (b) conflict with or contravene any application, registration, or filing made by such Party pursuant to its Intellectual Property Rights in the Program Technology (including any Patent).

b.    EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND ANY SOW HERETO, NEITHER PARTY MAKES ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THIS AGREEMENT.  ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED BY THE PARTIES.

9.    Information

a.    LIMO and VF will inform each other as quickly as reasonably possible in respect to the development work, in particular about changes that significantly affect the time schedule and/or the costs and/or decisions of the Parties in the course of all phases of the works as outlined in the SOWs hereto.

b.    VF is entitled to obtain relevant information at any time during review meetings, or, alternatively, on prior written notification requesting the status of the development work at LIMO within normal office hours.  Insights into LIMO's



proprietary process in conducting the development work, including production and any trade secrets unrelated to the VF Field of Use, may be denied only if such denial would not conflict with another term of this Agreement, and provided that such requested information is not subject to disclosure obligations under this Agreement, including for compliance with the other contractual obligations hereunder.

10.   Claims for Defects in Terms of Development

    a.   If a defect in the results obtained from the development process appears after the respective stage of the development has been concluded, LIMO, at its own expense, will rectify the defects within a reasonable period of time and then resubmit the results of the development to VF.  LIMO will also, at its own expense, make any necessary changes or modifications in the developments of subsequent stages.

11.   Documentation

LIMO shall provide a full documentation of every stage of the development.  This documentation shall include all results, plans, drawings, reports, and other documents which are necessary or useful to understand and use the development results.  The documentation shall be submitted to VF in electronic form at least at the end of every development stage, regardless of whether the development in that stage was successful.

12.   Claims Based on Infringement of Intellectual Property Rights

LIMO shall indemnify, defend, and hold harmless VF and its directors, employees, agents, affiliates, successors, and permitted assigns (collectively, "VF Indemnified Parties") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interests, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees incurred by the VF Indemnified Parties, arising out of or resulting from any claim of a third party alleging that any of the products developed hereunder, including products embodying Program Technology, or LIMO Background Technology licensed hereunder, or VF's receipt, use, making, selling, offering for sale, importing, reproducing, distributing, performing, or displaying such products, or Technology infringes, violates, or misappropriates any Intellectual Property Right of any third party.  LIMO will not enter into any settlement that imposes any liability or obligation on a VF Indemnified Party without such VF Indemnified Party's prior written consent.

13.   Other Claims, Liability

    a.   EXCEPT FOR LIABILITY ARISING UNDER SECTIONS 6 AND/OR 12, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL, OR OTHER INDIRECT DAMAGES HOWEVER CAUSED, WHETHER FOR BREACH OF CONTRACT, NEGLIGENCE, OR OTHERWISE, AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.



b.    The above limitations of liability do not apply (i) in the case of intent, or willful misconduct of legal representatives or employees or sub-contractors of LIMO, as well as any culpable violation of the essential Agreement, and (ii) after such time that a Supply Agreement has been entered into.

c.    Section 13.a does not apply (i) in cases in which LIMO is responsible for any failure of the delivered products that resulted in personal injury or material damage to personal property, and (ii) to the injury of life, body, or health in the absence of warranted characteristics, or in the absence of a guaranteed quality, if and insofar as the assurance or guarantee was intended to secure the contracting partner against the damages which do not originate from the delivered products themselves.

14.    Termination

a.    This Agreement will commence on the Effective Date and will continue until the earlier of: (i) final completion of all SOWs hereunder, or (ii) termination as provided below.

b.    Either Party has the right to terminate this Agreement if the other (i) refuses to or is unable to perform their obligations with respect to the development work hereunder; (ii) breaches any provision of Section 6 (NDA); (iii) materially breaches any other provision of this Agreement; (iv) files for bankruptcy, becomes insolvent or is declared insolvent, or is the subject of any proceedings related to its liquidation, insolvency, or the appointment of a receiver; or (v) makes an assignment for the benefit of all or substantially all of its creditors. Upon receipt of any termination notice, LIMO shall discontinue providing services on the date and to the extent specified in the notice.

c.    Upon termination or expiration of this Agreement, all rights and duties of the Parties toward each other will cease except under the following Sections, which will survive termination or expiration of this Agreement: Sections 1, 2.i, 2.j, 3, 4a-e, 4h, 6, 8, 12, 13, 14.b, 14.c, 15, and 16.

d.    Immediately upon completion of the Development Program under the SOWs hereunder, (i) the termination of this Agreement, or (ii) any request by VF which may be made at any time, LIMO shall deliver to VF any and all VF confidential information, VF property, and any Program Technology and related documentation, regardless of whether such Program Technology is complete or incomplete.

15.    Governing Law and Disputes

a.    This Agreement shall be governed by the laws of the United States of America and the State of Massachusetts, without regard to the United Nations Convention on the International Sale of Goods or other international treaty, rule or accord, and exclusive of conflict of laws principles. The Parties agree that venue for any judicial proceeding will be proper in Middlesex County, State of Massachusetts, United States of America. The Parties hereby irrevocably submit to the exclusive



jurisdiction of the federal and state courts located in Middlesex County, Massachusetts for the resolution of any claim under this Agreement, and each Party agrees not to assert any defense to any suit, action, or proceeding initiated by the other within Middlesex County based upon improper venue or inconvenient forum.

b. Prior to filing any claim or dispute arising hereunder in accordance with the preceding Section, the complaining Party will notify the other Party of such claim or dispute and negotiate in good faith to resolve such claim or dispute promptly. If negotiation does not resolve the claim or dispute, upon the request of either Party, any claim or dispute arising hereunder shall be referred to mediation in Waltham, Middlesex County, Massachusetts. Each Party will be responsible for its own costs associated with such mediation, including attorneys' fees and one-half of any mediation fees.

16. Miscellaneous

a. This Agreement is personal to the Parties and is not assignable, except in conjunction with a voluntary change in ownership, merger, acquisition, the sale, or transfer of all, or substantially all, of a Party's business or assets to which this Agreement pertains and subject to the prior notification (not consent) of the non-assigning Party.

b. Any notices that are necessary for the substantiation, assertion, or exercise of each Party's rights, in particular, notices of defects, setting of deadlines, or unilateral notices of termination under this Agreement must be in writing and delivered by courier or registered mail with a signature obtained at the receiving side. The addresses for such communications shall be:

If to VF to:

VulcanForms Inc.
318 Bear Hill Rd.,
Waltham, MA, 02451, USA
Attn: Martin Feldmann, President
Email: martin@vulcanforms.com

If to LIMO to:

LIMO GmbH
Bookenburgweg 4 - 8
44319 Dortmund, Germany
Attn: Dr. Guido Bonati, CEO
Email: G.Bonati@limo.de

c. No addition to, deletion from, or modification of any of the provisions of this Agreement (including any SOW) will be binding upon the Parties unless made in

writing, referencing this Agreement and the provisions to be modified therein, and signed by a duly authorized representative of each Party.

d.      All remedies under this Agreement shall be cumulative except as expressly provided otherwise, and each Party shall be entitled to seek any and all remedies available to it at law or in equity The Parties acknowledge that the disclosure of the other Party's confidential information or violation of the other Party's Intellectual Property Rights would cause substantial and irreparable harm to the other Party that could not be remedied by the payment of damages alone.  Each Party agrees that the other Party is entitled to seek and obtain preliminary and permanent injunctive relief and other equitable relief for any breach of Sections 3, 4, or 6.

e.      This Agreement may be executed in two counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Any signature required for the execution of this Agreement or any SOW may be in the form of either an original signature, a facsimile transmission bearing the signature of any Party to this Agreement, or any signature represented in a portable document format.  No objection shall be raised as to the authenticity of any signature due to the fact that said signature was transmitted via facsimile or is represented in portable document format.

f.      This Agreement shall not be construed for or against any Party by reason of the authorship or alleged authorship of any provisions hereof or by reason of the status of the respective Parties.  This Agreement shall be construed reasonably to carry out its intent without presumption against or in favor of any Party.  The word "including," when used herein, is illustrative and not exhaustive and means "including, without limitation."

g.      This Agreement, including the appendices and SOW referred to herein and attached hereto (which are hereby incorporated by reference), constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersede and replace entirely all previous discussions, prior agreements, and understandings concerning the same, whether oral or written.

h.      If any term or provision of this Agreement is found to be illegal, invalid, void, or otherwise unenforceable, this Agreement will remain in full force and effect, and such term or provision will be deemed stricken and the remaining provisions will not be affected or impaired and will be interpreted, as far as and if possible, so as to give them effect consistent with the original terms of this Agreement.  In the event of any conflict between the terms and conditions of this Agreement and the terms and conditions of any SOW, the terms and conditions of such SOW shall govern.

i.      The waiver of any term, condition, or provision of this Agreement must be in writing and signed by an authorized representative of the waiving Party.  Any such waiver will not be construed as a waiver of any other term, condition, or provision

except as provided in writing, nor a waiver of any subsequent breach of the same term, condition, or provision.

j.    Neither Party will represent itself as the agent or legal representative of the other Party or as a joint venture with the other Party for any purpose whatsoever, and neither will have any right to create or assume any obligations of any kind, express or implied, for or on behalf of the other Party in any way whatsoever.  Each Party is an independent contractor.  Each Party is responsible for the direction and compensation of its employees and shall be obligated to perform all requirements of an employer in accordance with applicable laws and regulations.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed and delivered as of the Effective Date.

**VulcanForms Inc.**

By: _____

Name: _Martin C. Feldmann_____

Title _President_____

**LIMO GmbH**

By: _____

Name: _____

Title _____

## **Appendices**

Appendix No. 1:
Phase 1 SOW

Appendix No. 2:
LIMO Background Technology

Appendix No. 3:
VF Background Technology

Appendix No. 4:
NDA

## Appendix No. 1

## Phase 1 SOW

### Development Program Description:

I.     Capitalized terms used in this Appendix No. 1 shall have the meanings assigned to them in the Amended and Restated Development Agreement.

II.    Development stages (DS).  DS — DS4 as defined in SOW.

III.   Specifications.  The specifications of the multi-kilowatt modulated line beam laser system are defined as follows:

LASER SOURCE
- Pixel size 105µm±5µm (depending on the final fiber size)
- Power per pixel ≥80W
- Total Power ≥4kW
- Modulation of output power from 0...100%
- Nominal line length: 5.25mm (at 80W/pix and 105µm/pix)
- Wavelength: 9xx nm
- Target scan speed lm/s (to be further defined in DS1)
- Homogeneity of the line in length direction at least within X% (further defined in WP1)
- Power profile of the line in width direction (to be further defined in DS1)

PLOTTER SYSTEM
- Number of axis: 2 (to be further defined in DS1)
- Axis range 50...100mm
- Line arrangement: linear, nominal Gap between Pixels in working distance plane: 0µm (tolerances to be further defined in DS1)
- Working distance: 100...150mm

CONTROLS
- Control interface for laser on/off/power(%) (to be further defined in DS1)
- Control for Feedback from Plotter position (to be further defined in DS1)
- Control for Plotter movement (to be further defined in DS1)

### Phase 1 Statement of Work:

Purpose.  Purpose of this project is to develop a 4kW laser line, segmented into rectangular dots, being individually addressable, tunable and scannable in one direction.

IV.    Development Stages:

- Development Stage 1 (DS1).  Setup of each one diode laser source of >80W with rectangular fibers of approximately 1001.1m and approximately 1501.1m. Delivery to VF and test of feasibility of the limited depth of field (DOF) for the melting of the powder film.  Test of fiber transmission and homogeneity.
- Development Stage 2 (DS2).  System master design at LIMO (A).  Split up of the different components to the suppliers for (B) the fiber coupled diode laser, (C) the supply rack with heat exchanger, (D) the plotter, (E) software developer for the interfacing.
- Development Stage 3 (DS3).  Delivery of all building blocks to LIMO.  Assembly and optimization to desired functionality.
- Development Stage 4 (DS4).  Delivery to VF and tests of operation.

V.    Development Stage schedule.  To be further defined in DS1.

VI.   Completed laser system delivery date.  Shipping of the completed laser system has to take place at the latest by February 15th, 2018 EXW Dortmund by airfreight.

VII.  Location of work.  LIMO's work will be performed at the company's primary location in Dortmund, Germany.  The DS1 confirming tests will be held in the VF primary location in Massachusetts, USA.  Bi-weekly meetings shall be held to synchronize and update all partners.  Delivery location of the pilot will be VF in Massachusetts, USA.

VIII. Applicable standards.  The system will be prepared for European conformity CE. Wherever UL (listed or recognized) is available, it will be considered as well.

IX.   Acceptance criteria.  The completed laser system will be tested prior to shipment to the following criterias:

LASER SOURCE
- Pixel size 105µm±5µm (depending on the final fiber size)
- Power per pixel $\geq$80W
- Total power $\geq$4kW
- Modulation of output power from 0...100%
- Nominal line length: 5.25mm (at 80W/pix and 105µm/pix)
- Wavelength: 9xx nm
- Target scan speed lm/s (to be further defined in DS1)
- Homogeneity of the line in length direction at least within X% (to be further defined in DS1)
- Power profile of the line in width direction (to be further defined in DS1)

PLOTTER SYSTEM
- Number of axis: 2 (to be further defined in DS1)
- Axis range 50...100mm
- Line arrangement: linear, nominal Gap between Pixels in working distance plane: Opin (tolerances to be further defined in DS1)
- Working distance: 100...150mm

CONTROLS
- Control interface for laser on/off/power(%) (to be further defined in DS1)
- Control for Feedback from Plotter position (to be further defined in DS1)
- Control for Plotter movement (to be further defined in DS1)

X.      Payment Schedule.  VF agrees to pay LIMO for its development costs and expenses for the Joint Development Program in accordance with this SOW a total amount equal to US$460,000 subject to the satisfactory completion of all development stages.

## Appendix No. 2

## LIMO Background Technology

| | | | | | |
|---|---|---|---|---|---|
| 2007-535067 | 30.09.2005 | 5420172 | 29.11.2013 | Laseranordnung mit Leistungsskalierung | approved |
| 06 806 582.0 | 27.10.2006 | 1 943 557 | 14.03.2013 | Homogenisierer mit optimalem Konkav/Konvex-Übergang | approved |
| 755617 | 08.06.2007 | 0755617 | 26.12.2008 | skalierbarer Homogenisierer | approved |
| 12/373,432 | 26D6.2007 | 8 395 844 | 12.03.2013 | Diodenlaserlinie durch Homogenisierer / trapezförmige WinkeNerteilung | approved |
| 200880013183.3 | 24.04.2008 | ZL 200880013183.3 | 10.04.2013 | Si-Rekristallisation durch Diodenlaser-Unie II | approved |
| 201080005134.2 | 17.02.2010 | ZL 2010 8 0005134.2 | 23.10.2013 | Homogenisierer mit Stufenspiegel und Unsenarray | approved |
| 10 721 689.7 - 1562 | 12.05.2010 | 2 430 491 | 16.12.2015 | Homogenisieren durch Überlappung homogenisierter Teilstrahlen II | approved |
| 13/634,915 | 23.03.2011 | ZL201180015320.9 | 11.03.2016 | Spiegelsystem für Mehrfachabsorption III | investigation |
| 10 2010 012 467.2 | 24.03.2010 | | | Retro-Transmission | registered |
| PCT/EP2012/058428 | 08.05.2012 | | | Schräges und homogenes Feld mit symmetrischen Unsen erzeugt | registered |
| 2015-530386 | 05.09.2013 | 14/426,885 | 01.09.2016 | Fokussierungsaufbau für zusammengesetzte Unsen | registered |
| 201380011103.1 | 11.02.2013 | ZL 201380011103.1 | 03.02.2016 | Laserbearbeitungsköpfe Rohrbearbettung/Rohlinn enschweiBen | approved |
| 10 2012 002 487.8 | 10.02.2012 | | | Laserbearbeitungsköpfe für das Anschmelzen von hochgeschwindigkeitsflammgespritzten Beschichtungen | registered |
| 14/436,589 | 14.10.2013 | | | Optik für Ringfokus im Rohr | investigation |

A - 4

| | | | | | |
|---|---|---|---|---|---|
| PCT/EP2014/054497 | 07.03.2014 | | | Off Axis Zoom Homogenisierer | national phase |
| 10 2013 103 422.5 | 05.04.2013 | | | Skalierbarer Unienfokus mit 500 W/mm und 1MW/cm$^2$ aus fasergekoppelten Grundmoden-Lasem | registered |
| 10-2015-7027097 | 13.03.2014 | | | Skalierbarer Unienfokus mit 500 W/mm und 1MW/cm$^2$ aus fasergekoppelten Grundmoden-Lasem | registered |
| 14/773,458 | 04.03.2014 | | | Homogenisierer mit großer Zerstörschwelle | investigation |
| 10-2015-7010516 | 24.09.2013 | | | Une generator | investigation |
| 201480027335.0 | 14.05.2014 | | | Homogene Zylinderbeleuchtung | investigation |
| N/A | N/A | N/A | N/A | Skalierbare Laserlinie mit gleichmäßiger Breite | to be registered |
| 10 2008 017 947.7 | 09.04.2008 | | | Homogenisator mit dispersiver Beugung | registered |
| 10 2008 024 697.2 | 21D5.2008 | 10 2008 024 697 | 07.11.2013 | Homogenisierer durch Polarisationsüberlagerung | approved |
| 10 2010 045 620.9 | 17.09.2010 | 10 2010 045 620.9 | 13.05.2016 | Skalierbares und modulares Strahlformungsprinzip zur Erzeugung beliebig langer, homogener Laserlichtlinien | approved |
| | | | | Homogenisierer mit optimalem Konkav/Konvex-Übergang | expired |
| N/A | N/A | N/A | N/A | Prozessierung von Silizium-Schichten | to be registered |
| 16 166 015.4 | 19.04.2016 | | | Anordnung zur dithten Wellenlängenkopplung | registered |
| WO 2005/085935 | | | | Monolithischer Doppel-Homogenisierer II | approved |
| PCT/EP 2005/001268 | | | | Unsymmetrischer Homogenisierer | registered |
| 10 2007 052 782.0 | | | | Bestrahlen einer TCO-Schicht mit Diodenlaserlinie | registered |

**Appendix No. 3**

**VF Background Technology**

| | | | |
|---|---|---|---|
| PCT/US16/42860 | 18.07.2015 | W02017/015241 | ADDITIVE MANUFACTURING BY SPATIALLY CONTROLLED MATERIAL FUSION |

**Appendix No. 4**

**NDA**

# Exhibit B



**VulcanForms**

VulcanForms Inc. | 20 North Ave. Burlington, MA 01803 | www.vulcanforms.com

**April 26, 2022**

LIMO GmbH
Bookenburgweg 4 – 8
44319 Dortmund, Germany
Attn: Mr. Dirk Bogs, COO

Copy To:
Focuslight Technologies
56 Zhangba 6th Rd,
High Tech Zone,
Xi'an, Shaanxi,
710077
China
Attn: Mr. Victor Liu, CEO

Subject: Election for the Payment of Minimum Profit.

Dear Mr. Bogs:

Reference is hereby made to the Definitive Agreement dated August 5th, 2017, and the Amended and Restated Development Agreement dated August 5th, 2017 (hereinafter the "Agreement") between VulcanForms Inc. ("VF"), and LIMO GmbH (collectively with any successors and assignees relating to the Agreement, to the extent any obligations or rights of LIMO under the Agreement have been assigned or transferred, "LIMO"). Capitalized terms not defined herein will have the meanings set forth in the Agreement.

For purposes of clarifying VF's payment obligation pursuant to the Agreement, VF submits the following notice of election for the payment of the annual Minimum Profit balance, effective as of March 28, 2022 (the "Effective Date").

Article 2 (j) of the Agreement sets forth the obligations of the Parties for Minimum Purchase, payment and calculation of Minimum Profit, and Exclusivity obligations, and as such, VF shall pay LIMO the calculated Minimum Profit based on the Minimum Profit chart below:



**VulcanForms**

VulcanForms Inc. | 20 North Ave. Burlington, MA 01803 | www.vulcanforms.com

| Year/Period | Minimum Purchase | or Minimum Profit |
|---|---|---|
| During development | $0 | $0 |
| Year 1-2 (from May 23, 2018) | $0 | $0 |
| Year 3 | $500,000 | $175,000 |
| Year 4 | $1,000,000 | $350,000 |
| Year 5 | $1,500,000 | $525,000 |
| Year 6 | $2,000,000 | $700,000 |
| Year 7 | $2,500,000 | $875,000 |
| Year 8 | $3,000,000 | $1,050,000 |
| Year 9 | $3,500,000 | $1,225,000 |

For Year 3 (May 23, 2020, to May 22, 2021) VF has paid in full a total amount of $1,036,380.86 which satisfies the Minimum Purchase payment. VF intends to continue paying the Minimum Profit amount from Year 4 to Year 9 (May 23, 2027), and for Year 4 VF shall satisfy its obligations for Minimum Profit payments by paying $350,000 on or before May 23, 2022, which shall effectively extend LIMO's Exclusivity obligations under the Agreement. LIMO's Exclusivity obligation will terminate 45 days after the end of any year in which VF fails to meet both the Minimum Purchase and the Minimum Profit amount, unless both Parties agree in writing to extend the Exclusivity.

The Exclusivity obligation is as follows:

"LIMO and LIMO Affiliates shall not (a) sell or distribute any Technology or products that are similar to or compete with the Program Technology or VF products resulting therefrom, (b) sell or distribute any products resulting from the Development Program in the VF Field of Use, or (c) grant licenses for others to sell, distribute, or develop such Technology."

For the avoidance of doubt, VF reserves the right to make Minimum Purchase orders for future years upon delivery of notice to LIMO or placement of written orders to LIMO. All terms and provisions of the Agreement are and will remain in full force and effect.

Sincerely,

*[signature]*

Martin Feldmann
President and CEO, VulcanForms Inc.

APPROVED
By Elizabeth O'Dess at 9:07 am, Apr 22, 2022

# Exhibit C



June 26, 2024

**VIA EMAIL & OVERNIGHT MAIL**

ATTN: Nicole Ma

Focuslight Technologies Inc.

No.56 Zhangba 6th Road

High-Tech Zone

710077 Xi'an

Shaanxi, P.R. China

RE: Termination of Exclusivity Period and Payments under the Agreement dated August 5, 2017, by and between VulcanForms Inc. ("Company") and LIMO GmbH ("LIMO") (the "Amended and Restated Development Agreement").

Dear Ms. Ma,

VulcanForms has determined not to continue with the Exclusivity Period under 2.j. of the Amended and Restated Development Agreement between the parties, and therefore will not continue to make the exclusivity payments set out in 2.j.ii. We understand that your exclusivity obligations will terminate 45 days after the end of this calendar year, or February 14, 2025.

Please let me know if you have any questions.

Sincerely,

*Josie Rivera*

Josie Rivera

Corporate Paralegal and Contracts Manager

VulcanForms Inc.

# Exhibit D

**FOCUSLIGHT**
Never stop exploring

Innovation
Manufacturing Excellence
Fast Response

## Letter of Demand

**12 July, 2024**

**TO: VulcanForms Inc.**
318 Bear Hill Road,
Waltham, MA
02451, USA

**FROM: Focuslight Technologies Inc.**
56 Zhangba 6th Road,
High-Tech Zone, Xi'an, Shaanxi
710077, P.R. China

**Address to: Martin C. Feldmann (President of Vulcan Forms Inc.)**
**Copy to: Josie Rivera (Corporate Paralegal and Contracts Manager)**

**Via Email:** martin@vulcanforms.com & jrivera@vulcanforms.com
**Original Copy delivered to** 318 Bear Hill Road, Waltham, MA, 02451, USA (978-602-7500)

**RE: Immediate Completion of the Year 6 Minimum Profit Payment of USD 700,000 under the Amended and Restated Development Agreement effective August 5, 2017 between VulcanForms Inc. ("VulcanForms") and LIMO GmbH ("LIMO")**

**Dear Mr. Martin C. Feldmann,**

This is a formal Letter of Demand from Focuslight Technologies Inc. (**"Focuslight"**) demanding **VulcanForms Inc. ("VulcanForms")** complete the Year 6 Minimum Profit Payment with the Amount of USD 700,000 under the Amended and Restated Development Agreement effective as of August 5, 2017 between VulcanForms Inc. (**"VulcanForms"**) and LIMO GmbH (**"LIMO"**) **before July 19, 2024** ("the Amended and Restated Development Agreement").

Upon receiving the official notification letter from VulcanForms dated June 26, 2024 regarding the termination of Exclusivity Period and Payments under the Amended and Restated Development Agreement for terminating exclusivity 45 days after the end of this calendar year (2024), or February 14, 2025, LIMO and its affiliates have already fulfilled the Exclusivity Obligations for the Year 6 (from May 23, 2023 to May 22, 2024), and VulcanForms shall pay LIMO for the corresponding Minimum Profit for the Year 6 (the Applicable Year) without Minimum Purchase

1 / 3

西安炬光科技股份有限公司
Focuslight Technologies Inc.

中国 陕西省 西安市 高新区 文八路 56 号      +86 29 8198 9045   sales@focuslight.com
56 Zhangba 6th Road, High-Tech Zone,      +86 29 8177 5810   www.focuslight.com
Xi'an, Shaanxi 710077, China

FOCUSLIGHT
Never stop exploring

Innovation
Manufacturing Excellence
Fast Response

from VulcanForms.

In accordance with Section 2.j.ii. stated in the Amended and Restated Development Agreement:

> *VF pays an amount equal to the minimum profit expectation of LIMO, as noted in the chart below ("Minimum Profit"), for the applicable year, provided that 35% of any purchase order placed by VF for the applicable year shall be subtracted from the Minimum Profit amount owed for the applicable year to maintain Exclusivity. By way of example in year 4, VF could maintain Exclusivity by 1)placing purchase orders with an aggregate value of $1,000,000, 2)pay LIMO $350,000 directly, or 3) order an amount of goods and services from LIMO in the amount of $100,000, for example ($35,000 of which would be subtracted from the Minimum Profit owed for such year), and pay LIMO the $315,000 difference.*

And also in accordance with the official letter from VF to LIMO on April 26, 2022:

> *For Year 3 (May 23, 2020, to May 22, 2021) VF has paid in full a total amount of $1,036,380.86 which satisfies the Minimum Purchase payment. VF intends to continue paying the Minimum Profit amount from Year 4 to Year 9 (May 23, 2027), and for Year 4 VF shall satisfy its obligations for Minimum Profit payments by paying $350,000 on or before May 23, 2022, which shall effectively extend LIMO's Exclusivity obligations under the Agreement. LIMO's Exclusivity obligation will terminate 45 days after the end of any year in which VF fails to meet both the Minimum Purchase and the Minimum Profit amount, unless both Parties agree in writing to extend the Exclusivity.*

LIMO received the Minimum Profit payments from VulcanForms:

1. for the Year 4 (May 23, 2021 to May 22, 2022) on May 16, 2022 ( the Year 4 End, before May 22, 2022);

2. for the Year 5 (May 23, 2022 to May 22, 2023) on May 09, 2023 (the Year 5 End, before May 23, 2023).

LIMO and its affiliates fulfilled the exclusivity obligations for the Year 6 (May 23, 2023 to May 22, 2024). However, the Minimum Profit for the Year 6 has not been received from VulcanForms by the Year 6 End, before May 22, 2024.

## Demand

Focuslight hereby firmly demands VulcanForms complete the Year 6 Minimum Profit Payment with the Amount of USD 700,000 under the Amended and Restated Development Agreement

西安焦光科技股份有限公司
Focuslight Technologies Inc.

中国陕西省西安市高新区 丈八六路 56 号
56 Zhangba 6th Road, High-Tech Zone,
Xi'an , Shaanxi 710077, China

+86 29 8188 9945    sales@focuslight.com
+86 29 8177 5810    www.focuslight.com

**FOCUSLIGHT**
Never stop exploring

Innovation
Manufacturing Excellence
Fast Response

immediately upon receiving this Letter of Demand before July 19, 2024. Failure to comply may result in Focuslight taking such measures as it may be advised including adjudication or litigation. In the event Focuslight is forced to adopt such measures, you are on notice that Focuslight will do so without further delay or notice to you. This letter may be given as evidence in the court as your failure to complete the Year 6 Minimum Profit Payment with the Amount of USD 700,000 under the Amended and Restated Development Agreement before July 19, 2024.

Very truly yours,

For and on behalf of
Focuslight  Technologies  Inc.
西安焦光科技股份有限公司

Simon Han

**Corporate Legal Department**
**Focuslight Technologies Inc.**

西安焦光科技股份有限公司
Focuslight Technologies Inc.

中国陕西省西安市高新区丈八六路56号
56 Zhangba 6th Road , High-Tech Zone,
Xi'an , Shaanxi 710077, China
+86 29 8188 9945  sales@focuslight.com
+86 29 8177 5810  www.focuslight.com

# Exhibit E



VulcanForms Inc. | 112 Barnum Rd. Devens, MA 01434 | www.vulcanforms.com

August 15, 2024

**TO: FocusLight Technologies Inc.**

56 Zhangba 6th Road,

High-Tech Zone, Xi'an, Shaanxi 710077, P.R. China

Delivered by email to:     Shilei Han, hansl@Focuslight.com

Copy by email sent to:

      Steven Wang Jian, wangjs@focuslight.com

      Yangsimeng Xing (Chloe), xingysm@focuslight.com

      Jinzhi Ma (Nicole), majz@focuslight.com

      Yiping Ye (Alison), yeyp@focuslight.com

**RE: Termination of Exclusivity Period and Payments under the Restated Development Agreement effective August 5, 2017 (the "Agreement") between VulcanForms Inc. ("VulcanForms") and LIMO GmbH ("LIMO")**

We are in receipt of invoices dated August 14, 2024 and June 27, 2024, both of which we dispute, as we have notified you in our email dated July 2, 2024.

We dispute your invoice based upon the following.

Section 2.j.ii of the agreement states

> "LIMO's Exclusivity obligation will terminate 45 days after the end of any calendar year in which VF fails to meet both the Minimum Purchase and the Minimum Profit amount, unless both Parties agree in writing to extend the Exclusivity."

As we have previously stated, this section allows the exclusivity to lapse if payment isn't made.  We have not made payment, and therefore the exclusivity should lapse.

The fact that the parties negotiated Section 2.j.ii into the agreement is clear evidence that the intention of the parties was that the remedy LIMO has for failure to pay is to terminate its exclusivity obligations.



VulcanForms Inc. | 112 Barnum Rd. Devens, MA 01434 | <u>www.vulcanforms.com</u>

Based on the above, our email of June 25, 2024, giving notice that we determined not to continue with the exclusivity payments stands. Per LIMO's rights under the Agreement, we consider the exclusivity obligations terminated.

Sincerely,

*Mona Sabet*

Mona Sabet
VulcanForms
cc: Thomas Pacheco